**In re FARMERS INSURANCE EXCHANGE CLAIMS REPRESENTATIVES' OVERTIME PAY LITIGATION**

No. MDL NO. 33–1439.

United States District Court, D. Oregon.

Feb. 26, 2004.

N. Robert Stoll, Jennifer A. Sammon, Stoll Stoll Berne Lokting & Shlachter, P.C., Portland, Steve Zieff, Rudy Exelrod & Zieff, L.L.P., James Finberg, Lieff Cabraser, et al., San Francisco, CA, Todd Jackson, Lewis & Feinberg, P.C., Oakland, CA, for Plaintiff.

Barnes Ellis, Stoel Rives, L.L.P., Portland, Lee Paterson, Jessie Kohler, Winston & Strawn, Los Angeles, CA, for Defendant.

AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW

ROBERT E. JONES, District Judge.

In this multidistrict litigation ("MDL"), the named plaintiffs, on behalf of themselves and other similarly situated current and former personal lines claims representatives ("CRs") employed by defendant Farmers Insurance Exchange ("FIE"), bring a collective action under the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. § 201 *et seq*, and class actions under seven states' laws, alleging that they are owed overtime pay.[1] Specifically, plaintiffs allege that they are entitled to recover overtime wages and liquidated damages from FIE because FIE inappropriately classified them as "exempt" from the federal and state overtime laws.

I held a three-week bench trial from September 8 through 25, 2003, on the bifurcated issue of liability. On November 6, 2003, I issued Findings of Fact and Conclusions of Law ("F & Cs") on liability, in which I concluded that FIE improperly classified auto physical damage CRs, certain property CRs, and certain other CRs as exempt from overtime under the FLSA and state laws, but properly classified the remaining CRs as exempt. I also concluded that FIE's conduct was "willful" for statute of limitations purposes, and that FIE failed to meet its burden of proof on its good faith defenses to liability and liquidated damages.

Following issuance of the F & Cs, on November 20, 2003, plaintiffs filed a request for clarification (# 534) of certain aspects of my decision. On December 15, 2003, defendant filed a motion for reconsideration and clarification (# 544).[2]

Plaintiffs' request for clarification seeks mostly minor corrections or slight elaboration of certain findings and/or conclusions. FIE, on the other hand, raises several major issues. First, in response to plaintiffs' motion, FIE argues that all of the state law overtime claims are preempted by federal law. I addressed that argument at an early stage in this MDL, ultimately denying FIE's motion to dismiss the state law claims on the basis of federal preemption. I decline to revisit that issue.

FIE also seeks reconsideration of the F & Cs concerning willfulness and good faith. Additionally, FIE seeks decertification and dismissal of the Michigan class action, based on a recent decision of the Michigan Court of Appeals, *Allen v. MGM Grand Detroit, LLC,* 260 Mich.App. 90, 675 N.W.2d 907, 2003 WL 22976658 (2003).

On February 23, 2004, I heard oral argument on the motions. I have thoroughly reviewed the parties' excellent memoranda and arguments, and have considered and reflected on my original F & Cs. Plaintiffs' motion (# 534) and FIE's motion (# 544)

1. In their fourth amended complaint, plaintiffs also asserted two class action claims under the Employee Retirement Income Security Act ("ERISA"). In April 2003, before certification of any ERISA classes, the parties settled the ERISA claims, agreeing, in essence, that if any class member prevails in any overtime claim and is awarded back pay, then the ERISA defendants will make all appropriate adjustments as required by ERISA, the ERISA regulations, and the governing ERISA plan documents. *See* Stipulation Regarding Waiver of Right to Jury Trial, Certification of Class Action Claims, Dismiss-

al of ERISA Claims and Other Matters (#422). Upon this court's approval of the stipulation, the ERISA claims and the ERISA defendants were dismissed with prejudice.

2. Additionally, Computer Sciences Corporation, the owner of the Colossus estimating software described in the F & Cs, moved to intervene (# 535) and requested an amendment to Finding of Fact No. 65 (# 537). By letter dated November 24, 2003, I agreed to delete the challenged language and denied the motion to intervene as moot.

are granted in part and denied in part as set forth in these Amended Findings of Fact and Conclusions of Law.

## PROCEDURAL BACKGROUND

On March 12, 2002, the Panel on Multidistrict Litigation transferred certain actions to this court for coordinated or consolidated pretrial proceedings with an action already pending here,[3] pursuant to 28 U.S.C. § 1407. After some preliminary proceedings, on September 9, 2002, I conditionally certified the FLSA claims to proceed as a collective action[4] and approved a form of *Hoffmann–La Roche*[5] notice to be sent to all potential collective action members permitting them to consent to join or "opt-in." Of 6100 notices sent to current and former FIE personal lines claims representatives, approximately 1170 opted in.

In late December 2002, plaintiffs filed a motion to certify seven class actions under Colorado, Illinois, Michigan, Minnesota, New Mexico, Oregon, and Washington overtime pay laws. FIE objected to class certification and, in turn, filed extensive motions to dismiss directed at plaintiffs' two claims under the Employee Retirement Income Security Act ("ERISA") and four of the state law claims. The briefing on these complex motions took several months to complete. On April 15, 2003, a few days before the scheduled oral argument, the parties notified the court that they had resolved much of their dispute, and on April 18, 2003, the parties submitted a Stipulation Regarding Waiver of Right to Jury Trial, Certification of Class Action Claims, Dismissal of ERISA Claims and Other Matters (the "April Stipulation")(# 422). Among other things, in the April Stipulation,

■ (1) the parties agreed to waive their right to a jury trial on any issue and stipulated to a bench trial before this court on all issues in all actions.[6] The parties also agreed to bifurcate the trial into a liability phase, to be followed, if necessary, by a damages phase (*see* April Stipulation, ¶¶ 1–3);

(2) FIE stipulated to certification of the seven state law class actions, consisting of personal lines claims representatives in job codes CL52, CL03, CL65, CLA5, CLA6, and CLA7;

(3) FIE stipulated that for purposes of the FLSA, Colorado, Illinois, Michigan, New Mexico, Oregon, and Washington claims, some class members worked more than 40 hours in some workweeks, and that for purposes of the Minnesota claim, some class members worked more than 48 hours in some workweeks; and

(4) the parties agreed to settle and dismiss the two ERISA claims and to dismiss all defendants other than FIE with prejudice. *See* footnote one, *supra; see also* April Stipulation, ¶ 12.

---

**3.** *Westcott et al v. Farmers Insurance Exchange,* No. CV 01–1105–JO, filed on July 19, 2001.

**4.** Unlike class actions certified under Rule 23, under the FLSA, an individual may become a party plaintiff in a collective action only if he or she files a "consent in writing," *i.e.,* "opts-in." 29 U.S.C. § 216(b).

**5.** *See Hoffmann–La Roche v. Sperling,* 493 U.S. 165, 110 S.Ct. 482, 107 L.Ed.2d 480 (1989).

**6.** In MDL litigation, the authority of the transferee court to handle the case ordinarily ends, at the latest, on conclusion of pretrial proceedings. *See Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach,* 523 U.S. 26, 36–37, 118 S.Ct. 956, 140 L.Ed.2d 62 (1998). Nonetheless, if the parties stipulate to trial in the transferee district, the stipulation will be given effect. *See In re Carbon Dioxide Industry Antitrust Litigation,* 229 F.3d 1321, 1327 (11th Cir.2000); *see also* Annotated Manual for Complex Litigation, Pt. III, § 31.14 (3d ed.).

On May 19, 2003, I issued an order and findings certifying the seven state law classes (# 438). From the evidence at trial, it appears that the class members in the various state class actions number more or less as follows: Colorado (326); Illinois (336); Michigan (322); Minnesota (229); New Mexico (103); Oregon (294); and Washington (353).

After the final pretrial conference, in which I received or rejected all exhibits and decided all motions in limine, I conducted a bench trial in the liability phase of the collective and class actions from September 8 through September 25, 2003. By effectively using our available courtroom technology, which included electronic presentation of exhibits, live testimony taken via video-conference, and presentation of excerpts of videotaped depositions, the parties were able to fully present their Power Point assisted opening statements, their witnesses, evidence, and Power Point assisted closing arguments in fourteen trial days, three weeks less than the anticipated minimum of six weeks.

The critical issue in the liability phase of this MDL is whether FIE correctly classifies its "personal lines claims representatives" as administrative employees exempt from the overtime pay requirements of the FLSA and the seven state overtime laws at issue. For purposes of this litigation, "personal lines claims representatives" or "CRs" include only the following job titles and job codes:

| JOB TITLE | JOB CODE |
|---|---|
| Claims Representative | CL52 |
| Special Claims Representative | CL65 |
| Senior Claims Representative | CL03 |
| APD Claims Representative | CLA5 |
| Senior APD Claims Representative | CLA6 |
| Special APD Claims Representative | CLA7 |

"APD" claims representatives (job codes CLA5, CLA6, CLA7) are those who handle auto physical damages claims not involving personal injury. The job categories CL52 (claims representative), CL65 (special claims representative), and CL03 (senior claims representative) include CRs who primarily handle property claims, i.e., real property and contents damages claims, CRs who primarily handle bodily and personal injury liability claims, and CRs who adjust Foremost policies.[7] In this opinion, I will refer to these four categories of CRs, which are the only categories at issue in this MDL,[8] as "APD CRs," "Property CRs," "Liability CRs," and "Foremost CRs."

To make the scope of this decision abundantly clear, the FLSA collective action and the state law class actions do not include, and thus this decision does not apply to, the claims of CRs for any time during which they are or were employed by FIE in the state of California during the relevant class periods,[9] FIE employees

---

7. The class members include FIE employees who handle claims arising out of Foremost policies. Exhibit ("Exh.") 2450, ¶ 10. The evidence revealed that Foremost policies cover, among other things, mobile homes, recreational vehicles, travel trailers, motorcycles, antique automobiles, off-road vehicles, and certain watercraft. The class members also include some Multi–Line CRs whose duties involve handling more than one of the identified types of claims.

8. See footnote 7.

9. The class periods set forth in the Hoffmann–La Roche Notice are three years before October 17, 2001, or, for CRs who worked at any time during that period in Oregon, three years before September 27, 2001. See Stipulated Order, Hoffman–LaRoche Notice and Consent to Join Form (# 129). The class periods set forth in the Order Certifying State Class Actions are: Colorado (since August 29, 1998); Illinois (since December 18, 1999); Michigan (since October 22, 1998); Minnesota (since October 3, 1998); New Mexico (since September 17, 2000); Oregon (since July 19, 1999); and Washington (since August 3, 1998). See Order and Findings Certifying State Law Classes, pp. 14–15 (# 423).

who are subject to the decision in *Bell v. Farmers Ins. Exchange*, 87 Cal.App.4th 805, 105 Cal.Rptr.2d 59 (2001), and FIE employees whose primary job assignment and duties categorize them as:

- Supervisors, temporary or otherwise
- Branch Managers, temporary or otherwise
- Regional Managers, temporary or otherwise
- Office claims representatives
- General adjusters
- Commercial lines claims representatives
- Workers' compensation claims representatives
- Circle of Dependability ("COD") auto shop coordinators
- MED/PIP claims representatives
- Malpractice claims representatives
- Professional liability claims representatives
- Environmental claims representatives

With the above procedural background in mind, in Part I of this decision, I turn first to FIE's argument concerning the Michigan class action. In Part II, I discuss the legal principles that will guide my analysis of the administrative exemption, followed by my findings and conclusions of law concerning the exemption. In Part III, I address the issues of willfulness and good faith.

## DISCUSSION

### PART I: THE MICHIGAN CLASS ACTION

As noted above, FIE seeks decertification and dismissal of the Michigan class action. The viability of the Michigan class action has been an unsettled issue since the outset of this MDL. *See, e.g.,* F & Cs, p.19 n.14 (*citing Severn v. Farmers Insurance Exchange,* Mich. Circuit Ct., County of Oakland, No. 01–0335558–CZ); F & Cs, p. 56 n.30.

■ On December 18, 2003, in *Allen v. MGM Grand Detroit, LLC,* 260 Mich.App. 90, 675 N.W.2d 907, the Michigan Court of Appeals held that an employer subject to the overtime provisions of the FLSA is not also subject to Michigan overtime law if application of the FLSA does not result in a lower minimum wage. The court's decision turns on statutory interpretation of Michigan law; specifically MCL 408.394, which provides:

> This act does not apply to an employer who is subject to the minimum wage provisions of the fair labor standards act of 1938[ ], 29 USC 201 to 216 and 217 to 219, unless application of those federal minimum wage provisions would result in a lower minimum wage than provided in this act.

In *Allen,* the court of appeals reversed the trial court's denial of the defendant employer's motion for summary judgment on plaintiffs' claims for unpaid overtime on the ground that "[d]efendant is an employer subject to the FLSA and application of the above referenced provisions [of the FLSA] to the present case does not result in a lower minimum wage." *Allen,* 260 Mich.App. at 96, 675 N.W.2d at 910.[10]

Plaintiffs contend that the *Allen* opinion addresses a very narrow issue, whether

---

**10.** Michigan federal district courts that have addressed the issue have held that where, as here, the employer is subject to the FLSA, Michigan wage law is inapplicable. *See, e.g., Vezina v. Jewish Community Center,* 1994 WL 762214 at *9–10 (E.D.Mich.1994)("Plaintiff does not challenge the fact that Defendant is an employer subject to the minimum wage provisions of the FLSA * * *. Accordingly, this Court finds that the Michigan Minimum Wage Law is not applicable"); *Hazel v. Michigan State Employees Assn.,* 826 F.Supp. 1096, 1102 (W.D.Mich.1993)(where plaintiffs admit in their complaint that employer is subject to FLSA, defendant entitled to judgment on the pleadings as to Michigan overtime compensation claim). Those, of course, are federal court opinions, not Michigan state court opinions, and they do not explore the issue in any depth.

the Michigan statute ("MWA") covers an employer where the FLSA's statute of limitations would result in an employee receiving a lower amount of unpaid wages. Plaintiffs argue that *Allen* does not address the question of whether an employer can be covered by the MWA where there are differences between the overtime exemptions provided by the MWA and the FLSA. According to plaintiffs, the Michigan exemption for administrative employees is more narrowly defined than the FLSA exemption.

I have already made my findings concerning the applicability of the administrative exemption under the FLSA and state law to the CR categories at issue in this proceeding. The liability phase of this proceeding is complete, thus, fine distinctions between Michigan law and the FLSA with respect to the administrative exemption, if any, are immaterial at this juncture. Nonetheless, because dismissal of the Michigan class might leave certain class members, specifically, those who are not also members of the FLSA collective action, without a remedy, I decline to decertify and dismiss the class now that liability has been determined on the merits.

## PART II: ADMINISTRATIVE EXEMPTION

### A. THE FLSA COLLECTIVE ACTION

#### 1. *The FLSA*

The FLSA ordinarily requires employers to pay their employees time and one-half for work exceeding forty hours per week. 29 U.S.C. § 207(a)(1). The FLSA provides certain statutory exemptions from the overtime pay requirements. *See* 29 U.S.C. § 213(a)(1). In this MDL only the exemption for persons "employed in a bona fide * * * administrative * * * capacity" is at issue. 29 U.S.C. § 213(a)(1).[11]

■ The employer bears the burden of establishing that an employee fits within an exemption. *Bothell v. Phase Metrics, Inc.,* 299 F.3d 1120, 1124 (9th Cir.2002)(*quoting Donovan v. Nekton, Inc.,* 703 F.2d 1148, 1151 (9th Cir.1983)); *Corning Glass Works v. Brennan,* 417 U.S. 188, 196–97, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974). Because the FLSA " 'is to be liberally construed to apply to the furthest reaches consistent with Congressional direction, * * * FLSA exemptions are to be narrowly construed against * * * employers and are to be withheld except as to persons plainly and unmistakenly within their terms and spirit.' " *Bothell,* 299 F.3d at 1124–25 (*quoting Klem v. County of Santa Clara,* 208 F.3d 1085, 1089 (9th Cir.2000)); *see also Alvarez v. IBP, Inc.,* 339 F.3d 894, 904 (9th Cir.2003); *Webster v. Public School Employees of Washington, Inc.,* 247 F.3d 910, 914 (9th Cir. 2001).[12]

#### 2. *The Regulations*

The FLSA delegates to the Secretary of Labor broad authority to "define[ ] and delimit[ ]" the scope of the administrative

**11.** Early in this MDL, FIE suggested that the executive, administrative, and/or Motor Carrier Act exemptions may apply to some or all of the CRs. FIE did not pursue the executive exemption, and dropped its reliance on the Motor Carrier Act exemption on the first day of trial.

**12.** In relying primarily on Ninth Circuit precedent, I note that in a federal MDL, there is a preference for "applying the law of the trans-

feree district." *See In re Cardizem CD Antitrust Litigation,* 332 F.3d 896, 912 n. 17 (6th Cir.2003)(citing *In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.,* 97 F.3d 1050 (8th Cir.1996)); *see also In re Korean Air Lines Disaster of Sept. 1, 1983,* 829 F.2d 1171 (D.C.Cir.1987)(law of transferor forum on federal question merits close consideration but does not have *stare decisis* effect), *aff'd* 490 U.S. 122, 109 S.Ct. 1676, 104 L.Ed.2d 113 (1989).

exemption. 29 U.S.C. § 213(a)(1). The Department of Labor ("DOL") has issued regulations interpreting the exception for administrative employees, to which I must give due deference. *Auer v. Robbins*, 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997).

■ The DOL regulations outline both "long" and "short" tests for administrative employee status. *See* 29 C.F.R. § 541.2(a)-(e) ("long test")[13]; 29 C.F.R. §§ 541.2(e)(2) and 541.214 ("short test"); *see also Martin v. Cooper*, 940 F.2d 896, 901 and 901 n. 4 (3d Cir.1991). In *Martin*, the court explained that the short test applies to employees who are compensated at a rate of not less than $250 per week, exclusive of board, lodging, or other facilities. In contrast to the long test, which requires that an employee "customarily and regularly" exercise discretion and independent judgment, the short test requires only that an employee's duties *include* work involving the use of discretion and independent judgment. *Martin*, 940 F.2d at 901 n. 4 (*quoting Donovan v. Tama Meat Packing Corp.*, 817 F.2d 54, 55 (8th Cir.1987)(emphasis added; internal quotations omitted)).

Under the short test, which, as explained below, applies in this case, an "employee employed in a bona fide * * * administrative * * * capacity" is any employee:

(a) who is compensated on a "salary basis" at a rate of at least $250 per week; and

(b) whose "primary duty consists of * * * [t]he performance of office or non-manual work directly related to management policies or general business operations of his employer or his employer's customers;" and

(c) whose duties include work "requiring the exercise of discretion and independent judgment."

*Bothell*, 299 F.3d at 1125 (*quoting* 29 C.F.R. § 541.2). These criteria are "absolute"; FIE must prove all of these requirements before this court may hold that any or all CRs are exempt from coverage under the FLSA. *See Bothell*, 299 F.3d at 1125 (citation omitted); *see also Bratt v. County of Los Angeles*, 912 F.2d 1066, 1069 (9th Cir.1990).

In *Webster, supra,* the court explained that the short test has two parts. The first, known as the "salary basis test," is met by proof that FIE pays the CRs at least $250 per week on a salary basis. 247 F.3d at 914. FIE has stipulated that all CRs are compensated at a rate of not less than $250 per week ($260 per week in Oregon). Defendant Farmers Insurance Exchange's Amended Trial Stipulations, ¶¶ 6, 7. Moreover, the evidence established that plaintiffs are paid a salary, and plaintiffs do not seriously contend otherwise. Consequently, the first requirement for use of the short test, the "salary basis test," is met.

The second and more analytically difficult part of the short test is known as the "duties test." *Webster*, 247 F.3d at 914. Despite some rhetoric early in the trial, the parties do not dispute that all CRs perform primarily "office or nonmanual work." 29 C.F.R. § 541.2(a)(1); *see also*

---

**13.** The "long test" is a four-pronged test that in essence asks, for employees earning not less that $155 per week, whether the employee (1) performs office or nonmanual work directly related to management policies or general business operations of the employer; (2) customarily and regularly exercises discretion and independent judgment; (3) regularly assists a proprietor or executive, or performs specialized work or executes special assignments under only general supervision; and (4) does not devote more than 20 percent of the workweek to activities other than those described above. *See* 29 C.F.R. § 541.2(a)-(e).

29 C.F.R. § 541.203 (nonmanual work defined). The parties do dispute and, consequently, the focus of the remainder of this portion of my decision is on the two major prongs of the "duties test": (1) whether the CRs' primary duties consist of work of substantial importance "directly related to management policies or general business operations" of FIE or FIE's customers; and (2) whether the CRs' duties include work "requiring the exercise of discretion and independent judgment." 29 C.F.R. § 541.2(a)(1) and (b).

### a. *"Directly Related To"*

A key requirement for the administrative exemption is that an employee's primary work be "directly related to management policies or general business operations of his employer or his employer's customers." 29 C.F.R. § 541.2(a)(1). The DOL regulations explain that the "directly related" phrase

> describes those types of activities relating to the administrative operations of a business as distinguished from "production" * * *. In addition to describing the types of activities, the phrase limits the exemption to persons who perform work of substantial importance to the management or operation of the business of his employer or his employer's customers.

29 C.F.R. § 541.205(a). With respect to "work of substantial importance," the regulations further explain:

> As used to describe work of substantial importance to the management or operation of the business, the phrase "directly related to management policies or general business operations" *is not limited to persons who participate in the formulation of management policies or in the operation of the business as a whole. Employees whose work is "directly related" to management policies or to general business operations include those whose work affects policy or*

*whose responsibility is to execute or carry it out.* * * *.

> (1) It is not possible to lay down specific rules that will indicate the precise point at which work becomes of substantial importance to the management or operation of a business. * * *

29 C.F.R. § 541.205(c) and (c)(1)(emphasis added).

The so-called "administration/production dichotomy" arises from the "production" language of section 541.205(a). Because the regulations suggest a distinction between the administration of a business on the one hand, and the "production" end of a business on the other, courts have often strained to fit the operations of modern-day post-industrial service-oriented businesses into an analytical framework formulated in the industrial climate of the late 1940s. As the Ninth Circuit noted in *Bothell,* however, "the administration/production dichotomy is useful only to the extent that it helps clarify the phrase 'work directly related to the management policies or general business operations,'" and cautioned that the distinction should "only be used as a tool towards answering the ultimate question, * * * not as an end in itself." 299 F.3d at 1126, 1127. As *Bothell* further explained:

> Indeed, the regulation from which the dichotomy derives does not stand alone. Rather, the administrative exemption is explicated in a series of interpretive regulations, of which 29 C.F.R. § 541.205(a) is only one, attempting to clarify the elusive meaning of the term "administration." * * *

> \* \* \* \* \* \*

The other pertinent cases from our sister circuits similarly regard the administration/production dichotomy as but one piece of the larger inquiry, recognizing that a court must "constru[e] the statutes and applicable regu-

lations as a whole." * * * Indeed, some cases analyze the primary duty test without referencing the § 541.205(a) dichotomy at all. This approach is sometimes appropriate because, as we have said, the dichotomy is but one analytical tool, to be used only to the extent it clarifies the analysis. Only when work falls "squarely on the 'production' side of the line," has the administration/production dichotomy been determinative.

*Bothell,* 299 F.3d at 1126–27 (citations and footnotes omitted); *but see Reich v. State of New York,* 3 F.3d 581, 588 (2d Cir.1993) (disagreeing that "the production/administrative dichotomy has limited usefulness outside the manufacturing context").

In this MDL, I suggested to counsel before trial that I did not perceive that the administration/production dichotomy would be useful to my analysis because the CRs are service providers, not production workers. I reiterated this observation several times during trial, and nothing I heard in the evidence or arguments persuaded me otherwise. Giving due deference to DOL regulations interpreting the FLSA as I must, *see Auer, supra,* 519 U.S. at 457, 117 S.Ct. 905, I find the administration/production dichotomy to be of no use in the decision before me. Consequently, I will make no further reference to the administration/production dichotomy analysis in this decision.[14]

In *Bothell,* the court explained that the "directly related" requirement is met "if the employee engages in 'running the business itself or determining its overall course or policies,' not just in the day-to-day carrying out of the business' affairs." *Bothell,* 299 F.3d at 1125 (*quoting Bratt,* 912 F.2d at 1070). The DOL has explained, however, that the "directly related" re-

quirement is not limited to those whose work affects policy or who bear responsibility for executing policy or carrying it out. Instead,

> [t]he phrase also includes a wide variety of persons who either carry out *major* assignments in conducting the operations of the business, or *whose work affects business operations to a substantial degree, even though their assignments are tasks related to the operation of a particular segment of the business.*

29 C.F.R. § 541.205(c)(emphasis added).

Relying on 29 C.F.R. § 541.205(c)(5), FIE suggests that the regulations themselves resolve the issue before this court, whether CRs are exempt administrative employees. That subsection states that "[t]he test of 'directly related to management policies or general business operations' is also met by many persons employed as advisory specialists and consultants of various kinds, * * * *claim agents and adjusters,* * * *."* 29 C.F.R. § 541.205(c)(5)(emphasis added).

The regulatory history of the DOL regulations is contained in a series of reports, known as the Stein Report (1940), the Weiss Report (1949), and the Kantor Report (1958). *See* 68 Fed.Reg. 15561. The "claim agent" language first appeared in the 1940 Stein Report. In noting that job titles alone are "of little or no assistance in determining the true importance of an employee to the employer," the Stein Report gives as one illustration that

> the term "claim agent." may cover a great variety of employees. A claim agent who settles claims for damages which in no case amount to more than five or ten dollars obviously performs mere routine work. On the other hand,

---

**14.** Indeed, the difficulty of applying the administration/production dichotomy in the 21st Century garnered extensive commentary in the DOL's proposal to update and revise the

FLSA exemption for, among others, administrative employees. *See generally* 68 Fed.Reg. 15560–66 (March 31, 2003).

a claim agent for a large oil company who is given authority to settle claims that amount to several thousand dollars must use discretion and judgment, and has the authority to affect the welfare of his employer in the most substantial degree.

Plaintiffs' Exh. 2384, Stein Report, p. 25 (footnote omitted).

The "claim agent" language in 29 C.F.R. § 541.205(c)(5) was included as an example in the interpretive regulations issued in 1949, and has remained unchanged since. In the introductory statement to the 1949 interpretive regulations, the DOL gave the following "few words of caution * * * in connection with the use of the illustrations":

> The exempt or nonexempt status of any particular employee must be determined on the basis of whether his duties, responsibilities, and salary meet all the requirements of the pertinent section of the regulations * * *. The employee's title or class specification is of no significance in determining whether he meets these tests. The use of any job titles in the illustrations contained in this subpart should not be construed to mean that employees holding such titles are either exempt or nonexempt, or that they meet any one of the specific requirements for exemption. *In any specific case it is the actual work performance, the responsibilities, and salary of the individual employee which determines whether a particular test has been met or whether the exemption applies.*

29 U.S.C. § 541.99(c)(1949)(emphasis added). Thus, although the DOL's use of the phrase "claim agent and adjusters" in the regulations is interesting, it does not resolve any issue before this court. As DOL notes in the regulations and as I said at the beginning of trial, my decision does not rest on job titles, job descriptions, or gen-

eralities; instead, my decision necessarily rests on a determination of what the FIE CRs actually do in performance of their jobs.

b. *"Discretion and Independent Judgment"*

■ The second major requirement for exempt administrative status is that the employee's primary duties include "work requiring the exercise of discretion and independent judgment." 29 C.F.R. § 541.205(e)(2). That requirement is satisfied if the employee "has the ability to compare, evaluate, and choose from possible courses of conduct. The requirement 'implies that the person has the authority or power to make an independent choice, free from immediate direction or supervision and with respect to matters of significance.'" *Bothell,* 299 F.3d at 1129 (*quoting* 29 C.F.R. § 541.207(a)).

Acknowledging that "[i]n one sense almost every employee is required to use some discretion and independent judgment," the DOL regulations clarify that "the discretion and independent judgment exercised must be real and substantial, that is, they must be exercised with respect to matters of consequence." 29 C.F.R. § 541.207(d)(1). Further, the regulations caution against misapplication and misunderstanding of the term discretion and independent judgment, noting "(1) [c]onfusion between the exercise of discretion and independent judgment, and the use of skill in applying techniques, procedures, or specific standards; and (2) misapplication of the term to employees making decisions relating to matters of little consequence." 29 C.F.R. § 541.207(b). The regulations give the following example of the distinction between the use of skills and the exercise of discretion and independent judgment:

> An employee who merely applies his knowledge in following prescribed proce-

dures or determining which procedures to follow, or who determines whether specified standards are met or whether an object falls into one or another of a number of definite grades, classes, or other categories, with or without the use of testing or measuring devices, is not exercising discretion and independent judgment within the meaning of § 541.2. This is true even if there is some leeway in reaching a conclusion, as when an acceptable standard includes a range or a tolerance above or below a specific standard.

29 C.F.R. § 541.207(c)(1).

DOL also has clarified that "discretion and independent judgment" does not necessarily imply that an employee's decisions must "have a finality that goes with unlimited authority and a complete absence of review":

> The decisions made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action. The fact that an employee's decision may be subject to review and that upon occasion the decisions are revised does not mean that the employee is not exercising discretion and independent judgment * * *.

29 C.F.R. § 541.207(e)(1).

3. *November 2002 DOL Opinion Letter*

■ In November 2002, after the cases in this MDL were filed, the DOL issued an opinion letter in response to an inquiry by the National Association of Mutual Insurance Companies stating, in essence, that insurance claims adjusters perform work that is administrative in nature. Exh. 1464 (WH Deputy Admin. Op. (Nov. 19, 2002)); *see* Exh. 1463 (letter of inquiry). The 2002 opinion letter is consistent with earlier DOL opinion letters on similar topics. *See* Exh. 1463 (attachments). Opinions of the DOL, like DOL regulations, are entitled to persuasive value if the position

of DOL is thoroughly considered and well reasoned. *See, e.g., Webster, supra,* 247 F.3d at 914 n. 2 (*citing Auer, supra,* 519 U.S. at 461, 117 S.Ct. 905); *see also Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944).

The 2002 DOL opinion letter is thorough, well reasoned, and, in this court's view, an accurate interpretation of the regulations at issue in this MDL; thus, it is entitled to deference, at least with respect to the interpretation of the regulations themselves. Beyond that, however, the opinion is of little value to my decision in that the facts presented to DOL for consideration blend all categories of CR and attribute the same duties and responsibilities to all CRs across the board, without regard to factual differences between APD, property, and liability claims adjusters, or, indeed, any of those categories of CR not involved in this litigation as described earlier in this decision. Consequently, the opinion letter, which is based "exclusively on the facts and circumstances" presented to the DOL, fails to distinguish between categories of claims adjusters.

As the complete evidentiary record before me demonstrates, the differences in the types of claims adjusting are more significant than the similarities for purposes of analyzing exempt status. As I stated before, my decision must be based on evidence of what the CRs in this MDL actually do, not on opinions issued in regard to facts and circumstances not before this court.

4. *Case Law*

Few of the cases on which the parties rely specifically address the exempt status of insurance claims representatives. In *Bell v. Farmers Ins. Exchange,* 87 Cal. App.4th 805, 105 Cal.Rptr.2d 59 (2001), a California appeals court affirmed a trial

court decision that rejected FIE's administrative exemption defense under California law.[15] The *Bell* court applied the administrative/production dichotomy to the record before it, ultimately concluding that the claims representatives were restricted to routine and unimportant work or, on matters of greater importance, acted as mere conduits of information to supervisors. 87 Cal.App.4th at 828, 105 Cal.Rptr.2d 59.

The trial court decided *Bell* on summary judgment, on a record, which, as described by the court of appeal, "confirm[ed] the accuracy of FIE's own description of the claim representatives' responsibilities as being restricted to 'the routine and unimportant.'" 87 Cal.App.4th at 828, 105 Cal. Rptr.2d 59. The record before me permits no such generally-applicable description. Moreover, although *Bell* discusses the FLSA, it was decided under California, not federal, law. And *Bell*'s focus on the administrative/production dichotomy appears to have skewed the court's overall view of FIE's business activities and the CRs' place in those activities. I thus find *Bell* to be of little guidance on the factual and legal issues before me, except with respect to its role in the analysis of willfulness and good faith, as discussed later in this decision.[16]

*Palacio v. Progressive Insurance Company*, 244 F.Supp.2d 1040 (C.D.Cal.2002), and *Jastremski v. Safeco Insurance Companies*, 243 F.Supp.2d 743 (ND Oh.2003), also were decided on summary judgment.

In each case, the district court found that the plaintiff insurance claims representative was an exempt administrative employee under the FLSA.[17] Neither case involved FIE or a fully developed record as exists in this case. Consequently, although *Palacio* and *Jastremski* are interesting and offer some insight, particularly *Jastremski*'s discussion of the 2002 DOL opinion letter, they offer little insight with respect to the FLSA exemption issues before me.

**B. THE STATE LAW CLASS ACTIONS**

As stated in my Order and Findings Certifying State Law Classes (# 438), the administrative exemption test under the state wage laws is substantially similar to, if not identical in some instances, to the FLSA test. *See* Order and Findings, pp. 10–11. Consequently, my liability findings and conclusions on plaintiffs' FLSA claim apply to plaintiffs' state law claims. Any specific differences between the various state laws in the area of damages will be addressed, if necessary, in future proceedings.

**C. FINDINGS OF FACT RE: ADMINISTRATIVE EXEMPTION**

Having outlined the underpinnings for my analysis of the administrative exemption, I turn now to my factual findings. I will begin with findings that pertain generally to all CRs, then move to findings

15. FIE challenged this ruling again on appeal and again failed to achieve reversal. *See Bell v. Farmers Insurance Exchange*, 115 Cal. App.4th 715, 9 Cal.Rptr.3d 544, 2004 WL 232371 (1 Dist. Feb.9, 2004).

16. I decline FIE's invitation, made during closing arguments, to declare that *Bell* is wrong. *Bell* was decided on record developed on summary judgment, which is not before me, and addresses California law. Thus, even if inclined to do so, I am in no

position to second-guess the *Bell* court, although some of the factual portrayals in *Bell* were flat wrong, *e.g.,* that FIE's business is limited to claims adjusting.

17. The plaintiff in *Palacio v. Progressive Insurance Company*, 244 F.Supp.2d 1040 (C.D.Cal. 2002), also brought overtime pay claims under California law. The district court denied the cross-motions for summary judgment on the state law overtime claims, finding triable issues of material fact.

specific to each of the three categories of CRs, APD, property, liability, Foremost, and Multi–Line.

*General Findings of Fact*

The following findings of fact apply to all categories of CRs, unless noted otherwise.

1. The FLSA and state law class members are current and former CRs of FIE who were employed within the relevant class periods in one or more of the following FIE job classifications: CL52, CL65, CL03, CLA5, CLA6, or CLA7. With the exception of the Illinois representative plaintiff, Heather Tan,[18] the claims of the representative plaintiffs are typical of the claims of the represented classes.

2. FIE is an employer that is subject to the overtime pay provisions of the FLSA and the comparable overtime provisions of the laws of Colorado, Illinois, Michigan, Minnesota, New Mexico, Oregon, and Washington.

3. FIE is a reciprocal or inter-insurance exchange providing insurance pursuant to the California Insurance Code and is owned by its policyholders. A reciprocal exchange consists of "subscribers" who exchange contracts with one another and provide insurance among themselves.

4. As required by California law, at the time of applying for insurance, subscribers of FIE appoint Farmers Group, Inc., as their exclusive "attorney-in-fact." Farmers Group, Inc., acts as FIE's agent in performing or securing some or all of certain services and facilities necessary for FIE's management, including human resources, accounting, payroll, marketing, development and pricing of insurance products, financial and regulatory auditing, underwriting, actuarial functions, and data processing. Many FIE employees also perform some of these same services and functions.

5. FIE performs all the functions of an insurance company, including selling insurance policies, contracting with agents who sell policies and service customers, procuring and selling reinsurance, and adjusting, settling, and otherwise resolving claims made on its policies. Thus, although FIE CRs adjust claims, FIE is not a claims adjusting company and its business is not restricted to selling claims adjusting services.

6. The "Farmers Insurance Group of Companies" is a registered service mark. Over 20 insurance companies, known as "domestics" and which are subsidiaries of FIE and two affiliated entities, Fire Insurance Exchange and Truck Insurance Exchange, use this service mark. In 2000, FIE and the two affiliated exchanges acquired Foremost Company of America, which issues certain specialty policies. *See* footnote 7. Foremost CRs became FIE CRs on January 1, 2001. Approximately 190 members of the current classes are or were CRs handling Foremost claims.

7. FIE's customers consist of domestic insurance companies and FIE policyholders. In handling a claim, a CR works for both the insurance company that insured the risk and the policyholder.

8. In 2002, FIE had over four million policies in force and annual premium revenues in excess of $3.8 billion.

9. Approximately fifty percent of FIE's 10,000 employees are employed as CRs. FIE maintains somewhere between 120 and 160 branch offices.

10. All FIE CRs receive home office training, including some standardized

---

**18.** Heather Tan is a Liability CR, and is exempt from overtime under this decision. I decline, however, FIE's invitation to dismiss the Illinois class on this basis. Nevertheless, I will require plaintiffs to provide a nonexempt Illinois class representative within 30 days of this decision.

training and some training that is not standardized. The training is a general, rather than detailed, overview because of differences between jurisdictions concerning coverage, liability, reserves, etc.

11. The parties agree that the job of an FIE CR is claims handling/adjusting. All CRs are classified in one of three different positions, CR, Senior CR, and Special CR, depending largely on experience and performance. The normal route of promotion is from CR to Senior CR, then to Special CR. Promotions are carried from one personal line to another; for example, a Senior APD CR who switches to property insurance will become a Senior Property CR, even though the CR has no prior property experience. Within any particular line of insurance, the job duties of CR, Senior CR, and Special CR are substantially the same.

12. The work of a CR is nonmanual work, except occasional manual work that is ancillary to the CR's primary job duties.

13. CRs are compensated at a rate not less than $250 per week ($260 per week in Oregon), on a salary basis, exclusive of board, lodging or other facilities.

14. The average annual salaries (not including bonuses and the value of other benefits) of the FLSA opt-in CRs for the years 1998 to 2002 ranged from $36,819 in 1998, to $42,366 in 2002. The median annual salaries (not including bonuses and the value of other benefits) of the FLSA opt-in CRs for the years 1998 to 2002 ranged from $34,400 in 1998, to $41,758 in 2002. In the relevant time period, rookie CRs earned salaries in the mid–20s, veteran CRs earned salaries up to the mid–60s.

15. The FLSA collective action members and the Colorado, Illinois, Michigan, New Mexico, Oregon, and Washington class members worked more than 40 hours in some workweeks during the respective class periods. The Minnesota class members worked more than 48 hours in some workweeks during the Minnesota class period.

16. The majority of CRs operate as "virtual adjusters," working in the field out of their homes. A CR's business card typically lists the CR's home address and the CR's own telephone and fax numbers. FIE provides CRs with home phone lines, computers and software, cellular phones, printers, and fax machines. FIE also assigns CRs company cars, and pays the portion of automobile insurance not attributable to personal use.

17. All CRs are supervised by supervisors and branch managers.

18. CRs with no authority or low levels of authority may be assigned the same cases as those with higher authorities. Assignment of claims largely is left to the discretion of the supervisor or branch manager, who assigns claims based upon a variety of criteria, including geographic location, type of claim, and the CR's experience level. In certain areas of the country, geographic location is the most important factor affecting assignment of claims. CRs in rural areas are more likely to handle more than one type of claim at a time, acting as "multi-lines CRs." Foremost CRs also may handle more than one type of claim, *e.g.*, material damage and bodily injury/liability, under the Foremost policies.

19. In general, a CR's duties with respect to any particular claim include representing FIE [19] to policyholders, claimants, and others involved in the claim's resolution (*e.g.*, witnesses, vendors, body shops,

---

[19]. The evidence showed that CRs work for FIE, but also represent the insurer, for example, Farmers Insurance Company of Oregon, that issued the particular policy involved. For ease of reference, however, I refer only to FIE throughout this decision.

outside experts, police, fire personnel, attorneys, claims representatives from other companies, judges, arbitrators), determining policy coverage, planning the handling of and investigating the claim, which includes inspecting the subject of the loss, setting or recommending reserves, recognizing and advising FIE regarding any fraud indicators, subrogation potential, and underwriting risk, estimating the claim, negotiating settlements, and documenting the file. The CR's duties may also include, as necessary, obtaining the assistance of experts, dealing with attorneys, and participating in mediation, arbitration, or trial.

20. In general, every CR must evaluate coverage issues. The evidence showed that with the computer Customer Restoration Network ("CRN"), CRs receive many claim assignments in which the issue of whether the policy was in force at the time of loss has already been resolved (denoted as "SOK" or status okay). The CR must evaluate all other coverage issues, however, such as whether the cause of loss is covered or excluded under the policy, whether a person qualifies as an "insured" under the policy, whether the subject of the loss is covered, and whether any deductibles apply. If the CR determines that a claim is covered, no supervisor approval is required before the CR proceeds to resolve the claim. If the CR determines that the claim is not covered, he or she refers the ultimate decision to deny the claim to a supervisor. In many cases, the CR will give the supervisor a draft denial letter along with the recommendation to deny coverage.

Coverage decisions are of substantial financial importance to FIE and are important to FIE's reputation with the insurance-buying public. A CR's erroneous determination of coverage will result in payment of claims that FIE is not legally obligated to pay; an erroneous denial of coverage, even on claims of relatively low value, may expose FIE to legal action and extra-contractual damages in many jurisdictions.

21. The CR plans and carries out the investigation of assigned claims and documents the investigation. This includes deciding, for example, whether and what photographs may be necessary, what documentation, such as police reports, should be obtained, and whether to retain expert assistance in determining the cause of loss. All CRs are expected to follow a same day contact rule, which requires some type of contact with the claimant on the day of assignment. The type of contact required varies with the type of claim.

22. The evidence showed that although the CR is responsible for planning and conducting the investigation, CRs are expected to follow certain procedures and guidelines, which may be subject to audit. With the advent of electronic files through the CRN, some supervisors regularly post "to do lists" directly into CRs' electronic claims files. Rarely, if ever, does a supervisor "reinvestigate" a claim, and most quality assurance ("QA") audits are performed on closed, that is, completed, files.

23. CRs handling liability claims, certain types of property claims, and APD claims are responsible for setting reserves, a requirement for compliance with state laws. To set a reserve, the CR must estimate FIE's exposure on the claim before the CR has completed his or her estimate of damages. Before institution of CRN, CRs would submit a form setting forth the estimated reserve amount, which was then put into the system by a supervisor or clerical employee. With CRN, the CR sets or recommends reserves directly and electronically, generally without first seeking supervisory approval. Setting reserves is a matter of substantial financial importance to FIE's business operations. Too low of a reserve can result in state-

imposed penalties; to high of a reserve affects FIE's surplus.

24. As part of the investigation and evaluation of claims, CRs watch for indications of fraud or arson and for subrogation potential, and evaluate whether the policyholder presents an unusual underwriting risk. CRs do not have the ultimate authority to act on or make decisions concerning these issues, but advise management of their findings and determinations. These job duties are financially important to FIE. For example, the evidence revealed that in 2002, CR diligence in identifying and referring fraud for investigation kept FIE from paying approximately $60 million in fraudulent claims. CR subrogation referrals yielded another $330 million in savings in 2002.

25. In most cases, CRs must estimate the settlement value of each claim. Estimating software for the different categories of claims came into use at different times during the different class periods. The software programs are discussed more fully below. FIE expects CRs to use estimating software whenever possible or appropriate. The estimating software acts as a price database, calculator, and organizational tool, much like parts catalogs, advertisements, vendor quotes, and jury verdicts, and usefulness largely is dependent, in many cases, on the quality of the information the CR develops *before* turning to the estimating software. A CR's estimate of the settlement value of a claim is a matter of financial importance to FIE. *See* No. 28, below.

26. Once the CR determines the estimated value of a claim, in most cases the CR negotiates a settlement. Depending on the type of claim, negotiations may involve the policyholder, claimants, other claims representatives, attorneys, public adjusters, auto body shops, contractors, and others.

27. FIE gives almost all CRs an authority amount within which they may settle claims without the approval of a supervisor. The amount of authority assigned is within the discretion of the branch manager, but may not exceed his or her own authority level. As a general rule, less experienced CRs have lower authority levels.

If a CR determines that the settlement value of a claim exceeds his or her authority, the CR seeks supervisor approval for additional authority. In most cases (75–100 percent of the time, depending on the witness), the supervisor accepts the recommendation without conducting any independent investigation into the loss. A CR's negotiation of a reasonable settlement is a matter of substantial financial importance both to FIE and to the policyholder.

28. On average, each CR pays approximately $1 million in claims per year. The average APD claim is $2,800–3,000, the average property claim is $3,000–4,000, and the average liability claim is $6,500–8,000.[20] FIE pays an average of $7–8 billion in claims per year.

29. FIE provides CRs with written guidelines for handling claims, including training materials, manuals, quality assurance guides, and forms. Some procedures are mandatory, some are merely recommendations and guidelines. Some guidelines are necessitated by state regulations; FIE generates others to ensure that CRs provide quality claims handling to policyholders, to protect FIE from claims of unfair claims practices, and to ensure FIE fulfills its obligations to its policyholders

**20.** Different witnesses quoted different figures. The exact amounts are not material to this liability decision.

while preserving its financial assets. FIE's "best practices" [21] are guidelines, but can become quality assurance issues if not followed.

30. The parties agree that all CRs' claims files may be subject to QA audits. FIE has a "zero tolerance" for overpayment and a settlement philosophy of "we pay what we owe, nothing more, nothing less." To this end, FIE has a QA program and conducts QA audits. One type of audit is a closed file audit, which is an audit of a statistical sample of recently closed files, 95 out of 8,000 files per year per branch office. The main goals of the closed file audits are to identify trends, to determine lost economic opportunity or "LEO" (a subjective assessment of the difference between what was paid and what could have been paid if a CR correctly handled and documented a claim), and to ensure that CRs are following best practices. The QA compliance goal for best practices is 91 percent. The QA goal for "leakage" or overpayment is two percent for APD and liability, and slightly more than two percent for property.

FIE supervisors also conduct case reviews, which are audits of pending files at the local level, at various intervals. Additionally, supervisors may conduct "ridealongs," in which they accompany CRs as they perform their work.

31. The evidence also showed that in catastrophic loss situations, such as hurricanes, tornadoes, floods, wildfires, and the like, any CR may be called upon to be part of a "CAT team," that is, a team sent to adjust the catastrophic losses. CAT team members receive extra compensation, but not overtime pay.

32. The parties also agreed at trial to the following:

a. CRs do not hire or fire other employees.

b. CRs ordinarily do not supervise other employees.

c. CRs do not evaluate other employees.

d. CRs do not prepare payroll.

e. CRs do not oversee employee benefit administration.

f. CRs do not make company budget decisions.

g. CRs have some authority to purchase services, including expert services, in connection with evaluating claims. CRs do not make ordinary purchases of FIE office supplies, except to the extent that a CR purchases office supplies for his or her own use.

h. CRs do not design insurance products.

I. CRs do not price insurance products.

j. CRs do not engage in sales and marketing, except with respect to the creation of good will for FIE.

k. CRs do not develop and plan advertising.

l. CRs generally do not obtain legal counseling for FIE except with respect to specific claims.

m. CRs generally do not engage in financial planning for FIE except with respect to their claims handling duties.

n. CRs do not engage in regulatory oversight of FIE.

o. CRs do not make investment decisions for FIE.

p. CRs may give input into claims handling procedures but do not other-

---

**21.** A "best practice" is "[a]ny action that can be implemented to prevent LEO." Exh. 1128 (Quality Assurance Glossary).

wise develop FIE procedures or policies for claims handling.

q. CRs do not have a duty to review other CRs' claims files.

r. CRs do not have ultimate authority to deny claims coverage, but do recommend to their supervisors if denial of coverage is appropriate.

s. CRs do not have ultimate authority to initiate fraud investigations but do recommend to their supervisors if a fraud investigation is appropriate.

*Specific Findings of Fact: APD CRs*

In addition to the above general findings of fact, I make the following specific findings pertaining to APD CRs:

■ 33. An APD CR handles auto physical damages claims. APD CRs make the majority of claims payments per year. As a general proposition, the basic job of an APD CR is estimating the claim, which involves looking at the vehicle, photographing it, using personal observation or software to determine if the vehicle is a total loss or if not, the cost to repair or replace with new or used parts, using experience to determine the number of hours for repair, and paying the claim. The assessments required of an APD CR in performing the job of auto physical damage claim adjusting largely are objective and technical. An APD CR must, however, have good communication skills, because he or she must deal with, among others, insureds, rental car companies, claimants, body shops, and tow companies.

34. Upon assignment of a claim, an APD CR must contact the policyholder, locate, inspect, and photograph the vehicle and, if necessary, obtain the policyholder's permission to obtain a tear down to verify damage.

35. In APD claims in which reserves are required, the CR recommends a reserve, but generally does not set it.

36. When an APD CR is assigned a claim, whether the policy is "SOK" ordinarily is predetermined and appears on the CRN screen. With respect to other coverage issues, the CR must watch for special equipment that might require coverage endorsements.

37. APD CRs consider subrogation potential, noting only "yes" or "no" on each file. APD CRs also look for fraud indicators and underwriting risk, and can refer files as appropriate to a supervisor for investigation. Additionally, APD CRs must learn to recognize and document, on a factual basis, pre-existing damage. These duties may require the CR to assess credibility.

38. APD CRs refer 20 to 30 percent of claims to Circle of Dependability ("COD") shops. The COD shops speed the claims process by handling repairable vehicles in certain types of claims, bypassing the CR and doing the substance of the CR's work. The APD CR first determines coverage, looks for fraud indicators and subrogation potential, then if appropriate refers the claim to a COD shop for an estimate. The COD shop writes estimates, repairs the vehicle, and sends a bill. The COD shops do not handle total loss claims, coverage issues, or claims in which there are fraud indicators, pre-existing damage, or subrogation potential. If the vehicle is a total loss, the claim is sent back to CR.

39. With the exception of total losses, an APD CR's basic options in negotiating an APD claim are to repair or replace the damaged parts. Additionally, to control costs, FIE directs APD CRs to consider the following:

a. Whether to offer an appearance allowance for superficial damage;

b. Whether to use new "OEM" (original equipment manufacturer) parts or "like kind and quality" aftermar-

ket parts, or to use salvaged or re-built/reconditioned parts;

c. Whether a shop discount might be available;

d. Whether to purchase certain parts from specialty shops; and

e. Whether to assess "betterment" or depreciation where repairs improve the original condition of the damaged vehicle. *See* Exh. 1021 (APD Follow–Up Training Guide (1997)), p. 4.

40. APD CRs use CCC software to estimate damage to vehicles. CCC has two programs: Pathways is used to estimate damages to repairable vehicles; Total Loss is used to determine the actual cash, or market, value of a totaled vehicle. The CCC programs cost FIE $8 million annually. A CR's use of CCC is subject to QA audit.

41. The Pathways software is similar to parts catalogs, in that it contains a pricing database, but has the advantage of time savings and increased accuracy. Pathways does not assess subrogation potential, fraud, underwriting risk, and pre-existing damage, nor does it make credibility determinations.

42. With CRN, administrative information pertinent to the claim, including the vehicle identification number ("VIN"), is automatically entered into the CCC program. The VIN number pre-loads the majority of the vehicle's standard options, and the CR enters the remaining options. When the CR selects a part to replace, Pathways calculates the cost of the part and certain labor costs (*e.g.*, painting, refinishing, etc.) automatically. Pathways also normally notifies the CR if an aftermarket part is available. If the CR changes the default prices, the reason must be documented. If the vehicle is to be repaired, the CR must determine the repair time and enter it manually. When repair costs approach a total loss, Path-

ways generates a pop-up warning based on averages.

43. Total losses account for 30 to 50 percent of an APD CR's claim files. Exh. 1029 (Total Losses (1997)), p. 2. APD CRs can use the Total Loss program to make total loss estimates, but must use good judgment in deciding whether CCC is the best tool for evaluating a total loss. Total Loss complies with many state regulations, but a state may require more or a different evaluation.

The CR uses Total Loss to establish a vehicle's actual cash value. In general, the CR enters the condition of a totaled vehicle using a condition matrix that FIE provides, documenting any deviations. Total Loss estimates the cost to repair, then gives comparable vehicle values. The CR then contacts salvage yards to get a salvage value. If the cost of repair plus the salvage value is greater than the actual cash value, the vehicle is totaled. Total losses that reach or exceed policy limits are often difficult to negotiate and settle, and require a very detailed evaluation.

44. In estimating antique, specialty, or older automobiles, the CR often cannot use Pathways or Total Loss, and must instead put together the estimate manually.

45. The evidence showed that in an average workweek of 38¾ hours, APD CRs can settle as many as four claims per day. However, many APD CRs routinely are assigned six or more claims per day. With the CCC software, it is possible for a CR to investigate and settle some claims in one hour, plus drive time.

### Specific Findings of Fact: Property CRs

■ In addition to my general findings of fact, I make the following specific findings pertaining to Property CRs:

46. Property CRs adjust two kinds of claims: building (or structure) and contents. About 35 percent of Property CRs

have authority levels in the range of $5,000 in check authority for buildings, $4,000 in check authority for contents, and $8,000 in estimating authority. Many Property CRs handle their claims over the telephone without leaving the office, and are non-exempt employees not involved in this litigation.

47. When a Property CR is assigned a claim, the initial coverage determination of SOK ordinarily has been made. SOK, which means that the policy was in force on the date of the loss, is only a starting place in the coverage determination. The Property CR must first check the policy to determine, among other things, whether the loss is covered, whether the building is covered, whether any limits apply, whether the policy is contents only, whether the insured is a renter, landlord, or home-owner, and whether any endorsements apply. Coverage determinations usually are routine but, of course, some coverage determinations are complicated. Supervisors ordinarily decide questionable coverage issues.

48. As part of the property claims procedures, the CR must determine the cause and origin of the loss. To do this, the CR must talk to the insured and, as appropriate, investigate, photograph, measure, and diagram the location and/or call in experts. This process, known as "scoping" the claim, helps the CR determine the source and object of the damage and ascertain what happened. Property CRs have guidelines for documenting files with photographs, detailed diagrams, customer contacts within 24 hours, physical verification of large inventories, and other guidelines, which are subject to QA audit.

49. After the initial investigation, the CR recommends a reserve, which the supervisor normally accepts. The evidence showed that because reserves are important to FIE's financial health, Property CRs do not simply set the reserve at their settlement authority. Instead, CRs must talk to insureds about their views of the damage and scope of the loss. The CR is the only person who meets the insured, and must set the reserve based on his or her best judgment as to the extent of the covered loss. In estimating and negotiating a property claim, the CR may be required to consider such items as repairing, cleaning, or replacing clothing, replacing food, methods of repair and alternatives to repair or replacement of buildings and exterior or interior building materials, cash as an alternative to repair, claims for additional living expenses, and the like.

50. Property CRs must evaluate potential subrogation and watch for indicators of theft, fraud, and arson, and refer files for further investigation if appropriate. These assessments may involve taking statements, which CRs are trained to do, and may require credibility determinations. Property CRs must also give underwriting risk advice on every structure inspected, which may require photographs and documented reasons.

51. Property CRs use two software programs as estimating tools. Xactimate, which estimates structure claims, is used in approximately 50 percent of all property claims. Xactimate pricing is updated quarterly by CD distribution or internet download. Where applicable, VIA, another software program, is used to estimate contents claims.

52. If the CR uses Xactimate through CRN, CRN pre-loads SOK and any deductibles. The CR is then prompted to set a reserve before performing the Xactimate workup. In obtaining information to enter into Xactimate, the CR may be required, if necessary, to bring in outside experts, for example, structural engineers to address foundation issues, arborists to assess replacement values of trees, and as mentioned, cause and origin experts. Property

CRs are not however, permitted to "abandon the claim to experts" and must manage expenses and define duties.

53. Xactimate has proven to be a reliable source for standardization of property claims. Nevertheless, each claim must be evaluated on its own merits because the CR still must determine depreciation, or the normal useful life of materials, by reference to a chart, and certain items cannot be priced through the Xactimate database. In such an event, the CR must price items through use of other resources, such as vendors. Additionally, the CR may sometimes change Xactimate pricing to reflect the local area if the change is within the CR's authority level, and the CR may have to recommend overriding Xactimate's pricing.

54. Some Property CRs use VIA [22] to estimate certain contents claims. For example, Property CRs can use VIA to price furniture, clothing, appliances, silverware, electronics, and certain other items of personal property. For items not covered by VIA, the CR may add them to the database or obtain prices from vendors and other sources. In estimating contents claims, a Property CR must assess the lifestyle of the insured to gain a picture of the actual items lost for purposes of accurately estimating the claim.

55. To estimate items like flooring or carpeting, the CR may submit samples to a company called ITEL, which provides a replacement cost. The CR then enters the ITEL estimate into Xactimate. If the CR uses something other than average materials, the reason must be documented.

56. In sum, Xactimate and VIA are pricing and replacement cost tools but do not assist the CR in the following:

a. Making coverage decisions;

b. Determining cause and origin;

c. Determining whether damage was pre-existing or related to the present loss;

d. Deciding whether damage should be repaired or replaced;

e. Evaluating the scope of damage, which may require assessing the insured's lifestyle; and

f. Evaluating underwriting risks, subrogation potential, fraud and arson indicators.

### Specific Findings of Fact: Liability CRs

■ In addition to the my general findings of fact, I make the following specific findings pertaining to Liability CRs:

57. Liability CRs are responsible for handling bodily and personal injury and death claims arising out of accidents involving FIE insureds.[23] As the Claims Representative Field Manual (Exh. 1011) explains:

No area of claims handling is more volatile nor more susceptible to the peculiarities of human nature than liability claims. Judges and juries consistently arrive at decisions that confound experienced observers.

[Recognize] that liability insurance contracts give insurers the right and duty to investigate, defend, or settle claims that are presented against their insureds. These rights and duties must be executed within the context of utmost good faith. There is an inherent understanding that the company's actions are undertaken for the benefit of the insured.

This responsibility carries with it obligations to investigate the validity of

---

**22.** The evidence suggests that at least some CRs no longer use VIA. For purposes of this decision, I will assume that during the relevant class periods, VIA was available as an estimating tool.

**23.** *See* footnote 19.

these claims quickly and thoroughly, to evaluate the seriousness of the claims objectively and accurately, and respond to these claims through settlement or defense, always taking action in the best interest of our insured. A few simple guidelines provide the foundation upon which our liability claims handling philosophy is built. These include prompt assignment, prompt investigation and timely follow through. Our actions are taken on behalf of our policyholder, and his/her interest must be our paramount consideration at all times.

Every CR will be expected to perform their duties intelligently, diligently and honestly, keeping in mind our general claims handling policy * * *.

Exh. 1011, p. B–1.

58. CRs handling liability claims are expected to determine who is liable for the loss after considering the facts, the credibility of witnesses, any documentation, and applicable law, and to assign liability, including apportioning liability between the various parties.[24] A CR's liability determination is of substantial financial importance to FIE and of substantial importance to the insured. If a CR determines that the policyholder is not at fault, then FIE likely must defend against the claim in costly legal proceedings. If, on the other hand, the CR determines that the policyholder is at fault, then FIE must pay the claim even if the CR is wrong. The CR's decisions also can affect the insured's insurance rates and/or ability to keep or obtain insurance.

59. A Liability CR's basic job duties include investigating, evaluating, and settling first- and third-party injury and death claims. Unless the CR makes a first contact settlement, he or she evalu-

ates the claim by obtaining, as appropriate, police reports, expert assistance, medical authorizations, reports, and billings, independent medical examinations, witness statements, and lost wage statements from employers.. The CR considers and assesses the nature and extent of bodily and personal injury, including pain and suffering. The CR also evaluates medical bills for necessity and reasonableness.

60. As with all CRs, Liability CRs must watch for fraud indicators, subrogation potential, and underwriting risk, and refer this information to their supervisors. Liability CRs also must evaluate coverage issues, and must be knowledgeable in areas of various state laws pertaining to insurance coverage, theories of liability and comparative fault, and tort law. Liability CRs also set or recommend reserves. In claims involving fatalities, the reserve is the policy limits.

61. Liability CRs use a software, known as Colossus, to estimate general damages, including pain and suffering, in cases where Colossus is applicable. Where Colossus is applicable, CRs use is considered mandatory. The evidence showed CRs use Colossus in approximately 70 percent of claims, either by choice or because use is mandatory. Of that 70 percent, approximately 30 percent of claims settle above the Colossus range; 13 percent settle below the Colossus range.

62. To use Colossus, the CR enters injury codes into the system. Colossus then assigns severity points to each injury code and a dollar value, presented as a range, based upon the severity points. A CR must obtain supervisor approval to settle a claim above the Colossus range. Some Liability CRs have the option to make structured settlements in claims over $10,000.

---

24. One witness, Shirley Pharis, testified that in liability claims in which she assessed less than ten percent comparative negligence to the other side, she could not settle the claims without first obtaining supervisor approval. This is confirmed by Exhibit 2453.

63. With many exceptions, CRs use Colossus in claims over $1,000. The exceptions include many of the most severe and difficult injuries, as follows:

a) Claims not eligible: fatalities, spinal cord injuries, severe burn or disfigurement claims, closed head injuries or brain injury claims.

b) Claimant is one year old or younger.

c) Obvious policy limit claims.

d) First call settlements.

e) Cases involving suspected fraud and referred to SIU for investigation.

\* \* \* \* \* \*

g) Nuisance value claims.

Exh. 1756, p. 1.

64. Colossus is a supposed to be a replacement for "round-tabling," that is, discussions among CRs concerning settlements in similar claims, jury verdicts, and the like. However, Colossus is incapable of considering external factors such as the character and credibility of witnesses, injuries or complications to pre-existing conditions not programmed into the system, the reputation and caliber of counsel, the availability and potential for exemplary damages, possible aggravated liability, and a multitude of other external factors. In cases where Colossus applies, if the CR's assessment is above or below the Colossus range, the CR must document the external factors supporting the assessment. *See* Exh. 1756.

65. A Liability CR's decision-making is highly subjective and discretionary. Although FIE claims that Colossus is a useful estimating tool, it does not and cannot replace the CR's judgment and experience.

66. Approximately 20 percent of liability claims are litigated. In such cases, Liability CRs may be involved in negotiations with plaintiffs' counsel, collaboration with in-house or outside counsel in preparation for litigation, and may participate in mediations and trials. As part of the litigation process, Liability CRs may be deposed and may be required to testify.

67. Foremost CRs are a unique group of adjusters who handle both physical damage claims and bodily injury/liability claims under the terms of the Foremost policies. Foremost CRs use Xactimate on the property side, with additions to the database for mobile homes and the like. Foremost CRs use Colossus for some bodily and personal injury claims. Each Foremost CR pays between $800,000 to $1.5 million in claims per year. For those Foremost CRs who handle bodily injury/liability claims as part of their jobs, I find them to be similar to Liability CRs for purposes of this decision.

## D. CONCLUSIONS OF LAW RE: EXEMPTION

Based upon the above findings of fact, I make the following conclusions of law:

1. This court has jurisdiction in this action pursuant to 28 U.S.C. §§ 1407(MDL), 1331 (federal question), and 1367 (supplemental state law claims).

2. All categories of CR meet the "salary basis test" for the administrative exemption. *See* 29 C.F.R. § 541.2(e)(1).

3. The primary duties of all categories of CR consist of work that is nonmanual field or office work in nature. 29 C.F.R. § 541.2.

4. The primary duties of all categories of CR consist of work that is directly related to FIE's management policies and business operations, in that the CRs are responsible to execute or carry out FIE's claims adjusting policies on behalf of FIE and the policyholders. 29 C.F.R. §§ 541.2(a)(1), 541.205(c).[25]

---

**25.** The finding that CRs represent both FIE and policyholders is supported by substantial

trial testimony, and FIE's motion for recon-

5. Almost all CRs handle $1 million or more in claims per year, and CRs' decisions in determining coverage, setting reserves, identifying and referring fraud, potential subrogation, and underwriting risks, and in negotiating and settling claims can and do have substantial financial impact on FIE and on FIE's policyholders. Consequently, the work of all CRs is of substantial importance to FIE's business operations and management policies. 29 C.F.R. § 541.205(a).

6. This brings me to the critical distinguishing factor among the various categories of CR: Whether the CR's primary duties include "work requiring the exercise of discretion and independent judgment," 29 C.F.R. § 541.2(e)(2), rather than the use of skills and "knowledge in following prescribed procedures or determining which procedures to follow * * *." 29 C.F.R. §§ 541.207(c)(1) and 541.207(b). With respect to this issue, not all CRs are alike; consequently, I address them separately.

### Liability CRs

Without hesitation, I conclude that Liability CRs exercise considerable independent judgment and discretion on matters of substantial importance. That Liability CRs may make recommendations for action rather than taking action, or that their decisions may be subject to review does not affect the analysis. *See* 29 C.F.R. § 541.207(e)(1).

### APD CRs

At the other end of the spectrum lie the APD CRs. Certainly APD CRs use some discretion in adjusting physical damage claims, but the evidence established that an APD CR's primary duties require the use of skill in applying techniques, procedures and specific standards, not the use

of discretion and independent judgment in matters of consequence. Significantly, in most cases, a vehicle's VIN number tells the CR almost everything there is to know about the vehicle involved. Vehicle damage is finite and limited to the value of a known entity from standard sources. Certainly, an APD must make choices among options in adjusting a claim, but with the advent of CRN and the use of CCC, the choices are limited and do not involve "matters of significance." 29 C.F.R. § 541.207(a). Consequently, I conclude that APD CRs do not meet the "discretion and independent judgment" prong of the administrative exemption.

### Property CRs

This brings me to the most troubling category of CR, the Property CRs. As one witness, Claire Bidlingmaier, put it, there can be "no soft tissue damage to a home." On the other hand, houses do not have VIN numbers, and even in subdivisions where homes may appear similar and use similar construction materials, many differences exist between houses and contents.

Many building and contents claims are routine and thus require the CR to exercise skill rather than discretion and independent judgment. The majority of property claims involve uncomplicated water and fire damage, and many property claims are less than $3,000, including any deductible. On the other hand, claims involving a home that has been destroyed, seriously damaged, the subject of a major theft, and the like, will require the CR to exercise considerable discretion and independent judgment. Because no home and no homeowner is the same, the CR may be called upon to evaluate the insured's lifestyle to help determine the quality of

---

sideration of this finding is denied. *See also* footnote 19 (defining FIE to include the other

Farmers insurance entities).

interior materials, furnishings, personal possessions, and the like. This, in turn, requires the CR to make credibility determinations, especially in cases where the insured has no records to support the claim or the records have been destroyed.

Also, in major losses, property coverage issues often are complex, and many property claims are not covered. Erroneous coverage decisions in favor of the insured affect FIE's finances directly; erroneous coverage decisions against the insured can expose FIE to bad faith claims and substantial extra-contractual damages, as well as statutorily-mandated attorney fees and costs.

It would be tempting not to segregate the CRs handling routine property claims from those handling more demanding claims. In balance, however, I am persuaded that Property CRs who regularly handle routine claims do not have the ability and meaningful responsibility to "compare, evaluate, and choose from possible courses of conduct," nor do they have the "authority or power to make an independent choice free from immediate direction or supervision and with respect to matters of significance." 29 C.F.R. § 541.207(a). Adjusting a burnt rug or a waterstained wall does not require any more discretion than that vested in an APD CR. In contrast, Property CRs who regularly handle losses that average, per month, in excess of $3,000 must exercise substantial discretion in claims evaluation and settlement and are not routine "foot soldiers" as contemplated for nonexempt status.

Thus, I conclude that FIE has not met its burden of proving that the primary duties of Property CRs who handle losses that average, on a monthly basis, less than $3,000 (the "lower level Property CRs") "*include* work requiring the exercise of discretion and judgment in matters of consequence," but has met its burden of proving that Property CRs who handle losses that average, monthly, more than $3,000 (the "higher level Property CRs") qualify as exempt employees. Because many of the higher level Property CRs are very experienced long term employees, they likely are more highly compensated than the "nonexempt" lower level Property CRs.

### Foremost CRs

 Because of the nature of the Foremost policies, Foremost CRs adjust unique physical damage claims, mobile homes, RVs, and the like, which requires specialized knowledge and discretion. Many foremost CRs also handle bodily injury/liability claims. For those Foremost CRs who handle such claims, like the Liability CRs, their primary duties include work requiring the exercise of discretion and independent judgment.

However, like lower level Property CRs, Foremost CRs who spend 38 ¾ hours or more per week handling property-type losses not involving bodily or personal injury or death, that average, on a monthly basis, less than $3,000, are nonexempt.

### Multi–Line CRs

For the reasons stated with respect to APD, Property, and certain Foremost CRs, Multi–Line CRs who spend 38¾ hours or more per week handling APD claims in any amount and/or property losses that average, on a monthly basis, less than $3,000, are nonexempt.

7. Based on the above, I make the following conclusions of law:

a. FIE has not sustained its burden of proving that the APD CRs fit within the FLSA administrative exemption from overtime pay and the equivalent exemptions under state law;

b. FIE has not sustained its burden of proving that the lower level Property CRs fit within the FLSA administrative exemption from overtime pay

and the equivalent exemptions under state law, but has sustained its burden with respect to the higher level Property CRs;

c. FIE has sustained its burden of proving that the Liability CRs fit within the FLSA administrative exemption from overtime pay and the equivalent exemptions under state law;

d. FIE has sustained its burden of proving that certain Foremost CRs fit within the FLSA administrative exemption from overtime pay and the equivalent exemptions under state law, but has not sustained its burden with respect to Foremost CRs who spend 38¾ hours or more per week handling property-type losses not involving bodily or personal injury or death, that average, on a monthly basis, less than $3,000; and

e. FIE has not sustained its burden of proving that Multi–Line CRs who spend 38¾ hours or more per week handling APD claims in any amount and/or property losses that average, on a monthly basis, less than $3,000, fit within the FLSA administrative exemption from overtime pay and the equivalent exemptions under state law.

## PART III: WILLFULNESS AND GOOD FAITH

Because I conclude that certain CRs are nonexempt employees under the FLSA and equivalent state overtime laws, I must resolve two additional issues: (1) whether FIE's classification of all CRs as nonexempt was a "willful" violation of overtime pay requirements; and (2) whether FIE acted in good faith and with reasonable grounds to believe that its classification of all CRs as exempt did not violate the FLSA.

I will address these issues in turn.

## A. WILLFULNESS

### 1. Legal Standard

■■■ Willfulness is a statute of limitations issue. If FIE willfully failed to pay overtime, then the limitations periods for the FLSA, Colorado, and Minnesota claims are extended from two years to three. 29 U.S.C. § 255; Colo.Rev.Stat. § 8–4–126; Minn.Stat. § 541.07(5).[26] The determination of willfulness is a mixed question of law and fact. *Alvarez v. IBP, Inc., supra,* 339 F.3d at 908.

The party claiming an exception to the normal FLSA limitations period bears the burden of showing that the violation was willful. The employer's mere negligence in determining its legal obligation is not sufficient; plaintiffs must present evidence that the employer affirmatively knew it was violating the FLSA or that it was acting in "reckless disregard" of the FLSA. *McLaughlin v. Richland Shoe Co.,* 486 U.S. 128, 133, 135 n. 13, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988).

■■■ As explained in my original F & Cs, in *Alvarez,* the Ninth Circuit permitted a finding of willfulness where the evidence demonstrated that the "employer disregarded the very 'possibility' that it was violating the statute * * *." 339 F.3d at 908–909 (*quoting Herman v. RSR Sec. Servs. Ltd.,* 172 F.3d 132, 141 (2d Cir. 1999)). FIE contends that the *Alvarez*

---

**26.** The statute of limitations on plaintiffs' Illinois, Michigan, and Washington claims is three years without regard to willfulness. 820 Ill. Comp. Stat. 105/12(a); Mich. Comp. L. Ann. § 408.393(1); Wash. Rev.Code § 4.16.080(2). The statute of limitations on plaintiffs' Oregon claim is two years, O.R.S. 12.110(3), and one year on their New Mexico claim. N.M. Stat. Ann. § 37–1–5.

test, that an employer acts willfully under § 255 if it ignores the "very possibility" that is violating the FLSA, "is nothing more than a reincarnation of the 'in the picture' test that was rejected by the Supreme Court in *McLaughlin v. Richland Shoe,* 486 U.S. 128, 133, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988)." Defendant Farmers' Motion for Reconsideration, p. 12.

In *McLaughlin,* the Supreme Court undertook to define the meaning of "willful" for purposes of the FLSA. The Court did, indeed, consider and reject the so-called "in the picture" test:

> The fact that Congress did not simply extend the limitations period to three years, but instead adopted a two-tiered statute of limitations, makes it obvious that Congress intended to draw a significant distinction between ordinary violations and willful violations. It is equally obvious to us that the *Jiffy June* standard of willfulness—a standard that merely requires that an employer knew that the FLSA "was in the picture"— virtually obliterates any distinction between willful and nonwillful violations.

486 U.S. at 132–33, 108 S.Ct. 1677. The Court explained that for purposes of the FLSA, "willful" means conduct that is not merely negligent, rather, it means

> the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute * * *.

486 U.S. at 133, 108 S.Ct. 1677.

*Alvarez* recognizes the *McLaughlin* test, and I do not perceive the "possibility" language to reinstate the rejected "in the picture" test, as FIE contends. The Ninth Circuit's use of a "possibility" test does, however, raise a question concerning its origins. The specific language in *Alvarez* is as follows:

> For § 255's extension to obtain, an employer need not knowingly have violated the FLSA; rather, the three-year

term can apply where an employer disregarded the very "possibility" that it was violating the statute, *Herman v. RSR Sec. Servs. Ltd.,* 172 F.3d 132, 141 (2d Cir.1999), although we will not presume that conduct was willful in the absence of evidence. * * *

*Alvarez,* 339 F.3d at 908. Thus, *Alvarez* imported the "possibility" language from *Herman v. RSR Sec. Services Ltd.,* a Second Circuit case, without any discussion or explanation. Having reviewed *Herman,* however, the facts fully justified the district court's finding of "reckless disregard," and the word "possibility" need not have been included in the discussion. *See generally Herman,* 172 F.3d at 141–42.

In another recent decision, *Chao v. A-One Medical Services, Inc.,* 346 F.3d 908 (9th Cir.2003), the Ninth Circuit cites *Alvarez* and the "possibility" language, but in a factual context that plainly established the employer's reckless disregard of the FLSA requirements. *See Chao,* 346 F.3d at 918–19. Thus, neither *Alvarez* nor *Chao* applied any "possibility" test and I reject that language as not only dicta, but wrong.

I conclude that the "possibility" language, by itself, is not the standard for willfulness, especially in view of the Supreme Court decision in *McLaughlin,* 486 U.S. at 133, 108 S.Ct. 1677. Moreover, "possibility" cannot reasonably be derived as a stand-alone standard for determining willfulness from either *Herman* or *Chao,* because the facts of those two cases demonstrate reckless or even knowing disregard. Nevertheless, my rejection of "possibility" as a definitive standard of willfulness does not change my analysis of FIE's liability in this MDL.

2. *Findings of Fact re: Willfulness*

a. The DOL historically has considered insurance claims representatives to be ex-

empt administrative employees. However, since the late 1990s, FIE has increasingly used in-house telephone adjusters, computers, computer software, and computer networking in the business of insurance claims adjusting. This modernization of claims adjusting practices casts doubt on the continued relevance or authority of many earlier DOL opinions. Nevertheless, as recently as November 2002, more than a year after the Bell decision was issued in California, DOL reiterated that insurance CRs are exempt from the overtime pay requirements of the FLSA.

b. In early 1994, DOL investigated a Farmers Insurance Group ("FIG") branch claims office in Independence, Missouri. In a letter dated February 4, 1994, DOL informed FIG that it had reviewed the CR field and office jobs in that office and had determined that the CRs were nonexempt. In March 1994, attorneys for FIE disagreed in writing to DOL. Among other things, FIE's counsel explained that

> Mr. Ramsey advised that the basis for your letter was an analysis of the types of duties generally performed by claims representatives, not a fact-specific analysis of each representative's duties. * * * Mr. Ramsey advised that this decision is based on a perceived "trend in the courts" regarding construction of the administrative exemption.

> Our review of the cases cited in your letter and other insurance industry cases establishes that such a "trend" does not exist regarding claims representatives. * * *.

Exh. 1825. The testimony at trial revealed that after FIE's response, DOL dropped the matter with no further action. As mentioned, several years later, in November 2002, DOL issued an opinion again finding that insurance CRs are exempt.

c. The historic industry standard among insurance companies has been to classify claims representatives as exempt. While "simple conformity with industry-wide practice" may be insufficient to defeat willfulness, see Reich v. Southern New England Telecommunications Corp., 121 F.3d 58, 71 (2d Cir.1997), FIE's knowledge of and conformance with industry practices is relevant to this inquiry. See, e.g., Vega v. Gasper, 36 F.3d 417, 428 n. 9 (5th Cir. 1994); see generally Nguyen v. Excel Corp., 197 F.3d 200 (5th Cir.1999).

d. It appears that some insurance companies recently have abandoned their historic practices and now pay overtime to some claims representatives. See generally Plaintiffs' Report Re: Classification of Personal Lines Claims Representatives at Other Insurance Companies.

e. The Bell decision alerted FIE that one court disagreed with its overtime pay policies. In response to Bell, FIE purported to initiate new practices regarding the work hours of all CRs. By memorandum dated September 12, 2001 (the "Price Memo"), FIE notified all CRs that they should limit their hours to no more than 38¾ in a workweek without first obtaining supervisor approval. Exh. 1018.[27] All CRs were required to acknowledge this policy in writing. See, e.g., Exh. 2512. FIE's counsel implied during oral argument on the present motions that this was more of a "paper lion" and was never meaningfully enforced, because of FIE's determined position that the CRs were all exempt. The evidence clearly demonstrated that FIE management and supervisors largely ignored any enforcement of this "policy." FIE reiterated the 38 ¾ hours per week work policy a year later, in September 2002, Exh. 2238, again without any

---

27. The document was referred to throughout trial as the "Price Memo," but Stephen Price testified in deposition that he did not author

the memorandum, it "was prepared by a committee, including lawyers, counsel," * * *. Deposition of Stephen Price, p. 247.

meaningful followup. As a result, most CRs ignored the "policy" and routinely continued to work 60 or more hours per week just to keep up with assigned claims and maintain their jobs.

f. FIE's current Director of Class Action Coordination testified at trial that he alone made the decision to continue classifying CRs as exempt. With no significant legal education or training, he claims to have made the decision based on consultation with human resources personnel, consultation with counsel, his own understanding of the regulations, his reading of various letters and documents, and on his belief that *Bell* was wrong.[28] He testified that *Palacio,* a non-precedential 2002 California district court opinion, confirmed his belief that CRs were exempt administrative employees. He further testified that although he consulted counsel, he not seek a formal opinion, and that because of ongoing litigation, he could not and therefore did not seek an opinion from DOL.

g. In its motion for reconsideration, FIE urges that whatever willfulness and lack of good faith existed on its part after *Bell,* as of November 19, 2002, the date of the DOL opinion letter, FIE's continued classification of all CRs as exempt was in good faith and not a willful violation of the FLSA. I am not persuaded. As noted earlier in this decision, although the DOL opinion letter appears to accurately interpret the regulations, the DOL conclusion that all CRs are exempt from overtime is premised on factual circumstances readily distinguishable and very different than those developed on the record in this case. Notably, by the time the DOL released that opinion, the cases underlying this MDL had been filed and were well under way. I find that FIE's decision to rely on

the DOL opinion and to disregard anything to the contrary does not demonstrate good faith or lack of willfulness after November 19, 2002.[29]

3. *Conclusions of Law re: Willfulness*

 *Bell* decided that FIE was violating California law, and with it, notified FIE that it might also be violating federal overtime law. I adhere, however, to my earlier finding that FIE's disregard of *Bell* does not alone amount to a knowing or reckless disregard or "willfulness" under the FLSA. *Bell* is not controlling on any issue in this case, nor does it address FIE's responsibilities under federal law. However, following *Bell,* FIE sent out a precatory notice to CRs limiting their hours to 38¾ per week unless the CR obtained prior authorization. Yet FIE continued to closely supervise their work product without any relief from constant over-assignment of claims that made it impossible for CRs to complete their work within the 38¾ hour time period. As a result, FIE's directives largely were ignored. FIE's feeble efforts evince the opposite of good faith and instead demonstrate a "knowing or reckless disregard" of FIE's overtime obligations under the FLSA as to those CRs found by this court to be nonexempt. If FIE truly believed that the CRs in issue here were exempt, FIE would have sent out a notice that unequivocally said so. Obviously, as to those CRs found to be exempt, this "willfulness" analysis is not applicable.

As mentioned, one troubling aspect of FIE's post-*Bell* conduct is FIE's Director of Class Action Coordination's testimony that he alone determined that FIE CRs were exempt and that he did not seek

---

**28.** Except with respect to California state law, *Bell* does not appear to have been applied or followed in other overtime litigation brought by insurance claims representatives.

**29.** I note that the parties have been silent as to whether FIE changed its overtime pay policies after I issued my original F & Cs on November 6, 2003.

counsel's formal advice on the issue. FIE waived any reliance on an advice of counsel defense, which it was entitled to do, thus preserving the attorney-client privilege and preventing discovery of the substance of any communications. I do not draw any inference, adverse or otherwise, as to what counsel's advice may have been. Nonetheless, that FIE did not seek formal advice of counsel is substantial evidence that FIE disregarded its duty of inquiry under the circumstances.

I recognize, as this case amply demonstrates, that the FLSA and the regulations are "fuzzy" and difficult to apply and are susceptible of many interpretations, and in the end, FIE was right in many of its interpretations. Even DOL has been so troubled with the vagaries of its outdated tests for the administrative and other professional exemptions that it very recently attempted to completely revise the regulations, *see* 68 Fed.Reg. 15560 (Mar. 31, 2003),[30] and efforts in that regard continue to date. Nevertheless, the evidence persuades me that after *Bell*, FIE "knowingly or recklessly disregarded" the key issue of whether its continuing classification of many CRs as "exempt" violated the FLSA.

In my original F & Cs, I stated that the date of the *Bell* appellate decision, March 5, 2001, was the critical date for purposes of the willfulness determination. On reflection, it is reasonable for FIE to have time to digest the impact of *Bell* and the reaction of the industry, and to formulate a position in response. FIE's position became clear on September 12, 2001, when FIE issued the Price Memo, unequivocally demonstrating both its awareness that the continued classification of all CRs as exempt was in substantial jeopardy and its desire to protect itself from exposure for overtime violations in light of the awareness that its classification policy could very well be wrong.

Consequently, I conclude that plaintiffs have proved that FIE's conduct was "willful" as to the nonexempt CRs within the meaning of 29 U.S.C. § 255, but only after September 12, 2001.

## B. GOOD FAITH AND REASONABLENESS

### 1. *Legal Standards*

The FLSA includes two good-faith defenses, one to liability and one to liquidated damages. The liability provision, § 259, reads, in pertinent part:

> [N]o employer shall be subject to any liability or punishment for or on account of the failure to the employer to pay * * * overtime compensation under the [FLSA] * * * if he pleads and proves that the act or omission complained of was in good faith in conformity with and in reliance on any written administrative regulation, order, ruling, approval, or interpretation, of [the DOL administrator], or any administrative practice or enforcement policy of such agency * * *.

29 U.S.C. § 259(a). Thus, § 259 insulates an employer from liability if the employer proves that " 'it acted in (1) good faith, (2) conformity with, and (3) reliance on the DOL's regulations or the Administrator's Opinion Letter.' " *Alvarez*, 339 F.3d at 907 (citation omitted).

---

**30.** Incidently, I note little clarification in the definition of "administrative employees" in the proposed regulations. The proposed rule, § 541.200, includes requirements that the employee have "a primary duty of the performance of office or non-manual work related to the management of general business opera- tions of the employer or the employer's customers," and "hold a position of responsibility" with the employer, whatever that might mean. *See* 68 Fed.Reg. 15560, 15587 (Mar. 31, 2003). Further action on the amended definitions by the DOL is expected in March 2004.

■ The test of § 259 good faith has both objective and subjective components, which, as described in *Alvarez,*

> ask[ ] how a "reasonably prudent [person] would have acted under the same or similar circumstances" and requir[e] "that the employer have honesty of intention and no knowledge of circumstances which ought to put him upon inquiry." * * * Section 259's test also places on employers "an affirmative duty to inquire about uncertain [FLSA] coverage issues," * * * putting "the risk of a close [good faith] case on the employer."

*Alvarez,* 339 F.3d at 907 (citations omitted). As *Alvarez* further noted, Congress did not intend the good faith defense to apply " 'where an employer had knowledge of conflicting rules and chose to act in accordance with the one most favorable to him.' " 339 F.3d at 907 (*quoting* 29 C.F.R. § 790.15(d) n.99 (1999)).

■ The second good faith provision, § 260, provides a full or partial defense to liquidated damages, which are mandated by the FLSA. *See* 29 U.S.C. § 216(b)(damages for violation of overtime provisions include unpaid overtime and "an additional equal amount as liquidated damages"). FLSA liquidated damages are not penalties but are considered to be compensation to the employee for the delay in receiving wages. *Alvarez,* 339 F.3d at 909; *see also Martin, supra,* 940 F.2d at 907. Under § 260, courts retain discretion to withhold some or all of the statutory liquidated damages award where

> the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA] * * *.

29 U.S.C. § 260.

■ To satisfy § 260 good faith defense, an employer bears "the 'difficult'

burden of proving both subjective good faith and objective reasonableness, 'with double damages being the norm and single damages the exception.' " *Alvarez,* 339 F.3d at 910 (*quoting Herman v. RSR Sec. Servs. Ltd.,* 172 F.3d 132, 142 (2d Cir. 1999)). If the employer fails to carry that burden, liquidated damages are mandatory. *Id.* (citation and internal quotations omitted).

Subjective good faith requires proof that the employer had an honest intention to ascertain and follow the dictates of the FLSA. *See Bratt,* 912 F.2d at 1072. The reasonableness of the employer's conduct is determined by an objective standard; to satisfy the objective standard, the employer must act as a " 'reasonably prudent [person] would have acted under the same circumstances.' " *Brooks v. Village of Ridgefield Park,* 185 F.3d 130, 137 (3d Cir.1999) (citations omitted). "Ignorance alone will not exonerate the employer under the objective reasonableness standard." *Martin, supra,* 940 F.2d at 907 (citation omitted).

### 2. *Factual Findings re: Good Faith Defenses*

With respect to the good faith defenses, I incorporate my factual findings concerning willfulness set forth in Part III.A.2. above.

### 3. *Conclusions of Law re: Good Faith Defenses*

My finding that some of FIE's overtime violations were "willful" forecloses a finding of good faith. *See Elwell v. University Hospitals Home Care Servs.,* 276 F.3d 832, 840 n. 5 (6th Cir.2002)("jury verdict finding that the employer acted willfully forecloses the possibility of finding that the employer acted in good faith"). Nonetheless, to clarify my reasoning, I will separately address FIE's good faith defenses.

### a. § 259 Good Faith

■ FIE satisfied the burden imposed by § 259 up to September 12, 2001. Before that date, FIE reasonably relied on DOL's consistent opinions and on industry practice for guidance. Thus, FIE had honest intentions in its interpretation of the pertinent regulations and its reliance on the related DOL opinions.

After the *Bell* decision on March 5, 2001, however, FIE gained "knowledge of circumstances which ought to put [it] on inquiry." *Alvarez*, 339 F.3d at 907. That knowledge imposed on FIE an affirmative duty of inquiry, "putting 'the risk of a close [good faith] case on [FIE].'" *Id.* The evidence was unequivocal that after *Bell*, FIE did not seek counsel's or DOL's formal opinion as to whether FIE's blanket classification of all CRs as exempt was correct. Instead, on September 12, 2001, FIE attempted to limit its potential exposure for overtime violations by making the "business decision"[31] to send out the Price Memo. In view of the conflicting rules on this issue, FIE's decision to act in accordance with the most favorable rule, while at the same time attempting to limit exposure, precludes a finding of § 259 good faith after September 12, 2001. *Alvarez*, 339 F.3d at 907.

### b. § 260 Good Faith

■ For similar reasons, I conclude that FIE has not satisfied its "difficult" burden under § 260 to prove both subjective good faith and objective reasonableness after September 12, 2001. *Bell* should have alerted FIE to carefully reexamine its employee classification practices. Instead, FIE sought to protect itself from potential exposure by making the empty demand that CRs limit their time to 38¾

hours per week in the absence of prior supervisor approval. Moreover, while FIE's failure to obtain a formal opinion of counsel or the DOL in the aftermath of the *Bell* decision in view of ongoing litigation may be understandable, it is not objectively reasonable in terms of FIE's obligation to make a good faith effort to comply with the requirements of the FLSA and various state overtime laws. As noted in *Martin,* ignorance "will not exonerate the employer under the objective reasonableness standard," 940 F.2d at 907, and neither does negligence. *See Elwell,* 276 F.3d at 840 n. 5.

In summary, I conclude that FIE has failed to satisfy its burden with respect to both the § 259 and § 260 good faith defenses after September 12, 2001, but acted in good faith before that date.

### CONCLUSION

Before making my final conclusions, I want to acknowledge all counsels' highest level of professionalism, tremendous cooperation, and remarkable efficiency in preparation and presentation of the liability trial phase of this MDL litigation.[32] Counsels' efforts greatly assisted me in my demanding task of making findings of fact and conclusions of law on these challenging but interesting issues.

Based on the above findings and conclusions, with respect to the issues of liability in this overtime pay litigation, I conclude as follows:

1. FIE's motion to decertify and dismiss the Michigan class action is granted and the Michigan class action is denied.

2. FIE violated the FLSA and the Colorado, Illinois, Michigan, Minnesota, New

---

**31.** FIE's Counsel made this characterization in the hearing on February 23, 2004.

**32.** From the MDL transfer order on March 12, 2002, less than 18 months passed before commencement of the liability trial phase on September 8, 2003.

Mexico, Oregon, and Washington overtime compensation laws in failing to pay APD, lower level Property CRs, and certain Foremost and Multi–Line CRs overtime.

3. FIE did not violate the FLSA and the Colorado, Illinois, Michigan, Minnesota, New Mexico, Oregon, and Washington state overtime compensation laws in failing to pay higher level Property, Liability, and certain Foremost and Multi–Line CRs overtime.

4. FIE's failure to pay APD and lower level Property CRs overtime was "willful" after September 12, 2001, for statute of limitations purposes.

5. FIE satisfied its burden of proving the FLSA good faith defenses to liability and to liquidated damages up to September 12, 2001, but not after. Thus, the nonexempt CRs described in Part II.D.7 of this decision are entitled to overtime pay and liquidated damages under the FLSA after September 12, 2001.

6. The seven states' laws at issue, Colorado, Illinois, Michigan, Minnesota, New Mexico, Oregon, and Washington, do not provide a good faith defense to liability. Therefore, the good faith analysis set forth in Part III.B.3.a. does not apply to the state law class actions.

7. Minnesota and New Mexico do not provide a good faith defense to liquidated damages. Therefore, the good faith analysis set forth in Part III.B.3.b. does not apply to the Minnesota and New Mexico class actions. The good faith analysis set forth in Part III.B.3.b. does apply to liquidated damages under Michigan and Washington law[33] and to waiting time penalties under Oregon law.

8. Subject to paragraphs 6 and 7, plaintiffs are entitled to liquidated damages under Minnesota and New Mexico law.

Plaintiffs are entitled to liquidated damages under Michigan and Washington law after September 12, 2001. Plaintiffs who were terminated from employment may be entitled to waiting time penalties under Oregon law after September 12, 2001.

9. Colorado and Illinois do not provide for awards of liquidated damages in overtime pay litigation. Additionally, the parties dispute whether Illinois law permits recovery of punitive damages in this type of action. The Illinois statute at issue provides as follows:

> If any employee is paid by his employer less than the wage to which he is entitled * * *, the employee may recover in a civil action the amount of any such underpayments together with costs and such reasonable attorney's fees as may be allowed by the Court * * *. At the request of the employee or on motion of the Director of Labor, the Department of Labor may make an assignment of such wage claim in trust for the assigning employee and may bring any legal action necessary to collect such claim, and the employer shall be required to pay the costs incurred in collecting such claim. Every such action shall be brought within 3 years from the date of the underpayment. *Such employer shall be liable to the Department of Labor for 20% of the total employer's underpayment and shall be additionally liable to the employee for punitive damages in the amount of 2% of the amount of any such underpayments for each month following the date of payment during which such underpayments remain unpaid.*

820 ILCS § 150/12(a); 56 Ill. Admin. Code §§ 210.1000, .1010 (emphasis added).

---

33. To the extent that Washington law tracks the FLSA, FIE's failure to establish good faith precludes a showing of a "bona fide dispute" for purposes of liquidated damages under the Washington Revised Code. Wash. Rev.Code §§ 49.52.070 and 49.52.050.

Thus, the issue is whether the statute allows a punitive damages award to the employee only in actions brought by the Illinois Department of Labor, or also in actions brought by the employee. The parties have not identified any controlling case law on this issue, nor have I found any. FIE relies on *People ex rel Dept. of Labor v. Soccer Enterprises, Inc.*, 302 Ill. App.3d 481, 236 Ill.Dec. 263, 707 N.E.2d 108 (Ill.Ct.App.1998), for the proposition that the first half of the statute, ending with the sentence concerning the statute of limitations, applies to employee suits, while the last half, containing the punitive damages language, applies only to DOL suits. *See* Defendant's Opposition, pp. 15–16. The *Soccer* case is not directly on point, but I am persuaded that the more reasonable interpretation of the Illinois statute is that punitive damages are available only in actions brought by the Illinois Department of Labor, and consequently I so hold.

10. Plaintiffs shall provide a nonexempt Illinois class representative within 30 days of this decision.

Under FRCP 53 as amended December 1, 2003, Special Master Edwin Peterson will assist the court in the damages phase of this proceeding. The specific procedures that will be implemented remain under advisement at this time.